# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

O-AT-KA MILK PRODUCTS COOPERATIVE, INC.,

                                        Plaintiff,

                        -vs-

TIC GUMS, INC., *et al.*,

                                        Defendant.

DECISION AND ORDER

13-CV-6347-CJS

## APPEARANCES

For Plaintiff:                          Jerauld E. Brydges, Esq.
                                        Harter, Secrest and Emery, LLP
                                        1600 Bausch & Lomb Place
                                        Rochester, NY 14604-2711
                                        (585) 231-1239

For Defendant:                          Dennis M. Rothman, Esq.
                                        Lester Schwab Katz & Dwyer, LLP
                                        120 Broadway
                                        New York, NY 10271
                                        (212) 341-4343

## INTRODUCTION

**Siragusa, J.** This commercial contract case is before the Court on Defendant's motion to dismiss, filed on October 25, 2013, ECF No. 13. Defendant contends that this case is filed in the wrong venue and that the complaint fails to state a claim. Fed. R. Civ. P. 12(b)(3) & (6). Plaintiff filed a memorandum in opposition on November 26, 2013, ECF No. 15, and Defendant filed a reply memorandum on December 13, 2013, ECF No. 17. The Court heard oral argument on January 16, 2014. The parties thereafter unsuccessfully engaged in mediation.  For the reasons stated below, the Court denies Defendant's motion.

**FACTUAL BACKGROUND**

The facts are taken from the complaint, filed on July 8, 2013, ECF No. 1. Although not attached to the complaint, the email correspondence and invoices exchanged by the parties are also considered by the Court as relied upon by OA-T-KA Milk Products Cooperative, Inc. ("OA-T-KA") in drafting the complaint. *See Global Network Commons, Inc. v. City of New York*, 458 F.3d 150, 156–57 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)) ("a necessary prerequisite for that exception is that the 'plaintiff[] *rel[y]* on the terms and effect of [the] document in drafting the complaint . . .; mere notice or possession is not enough.'").

OA-T-KA and TIC Gums, Inc. ("TIC") have a history of commercial transactions dating to 2004. OA-T-KA "manufactures milk-based and other value added products…[including] a no-sugar added nutritional beverage for diabetics (the 'Product')." Compl. ¶ 6. TIC "manufactures texture and stabilization products for the food industry, including gum arabic."[1] *Id.* ¶ 7. OA-T-KA purchased gum arabic from TIC beginning in 2004, and at that time, TIC fulfilled the orders with gum arabic manufactured in the United States. Beginning in August 2012, TIC began to fill orders with gum arabic manufactured in the United Kingdom. Compl. ¶¶ 8–10. OA-T-KA claims that the United Kingdom-manufactured gum arabic caused unsightly white particles and sedimentation in the Product. The Product was used mostly by hospital and nursing home patients through enteral feeding. Compl. ¶ 11. OA-T-KA claims that after an extensive investigation, it traced the cause of the problem to the United Kingdom manufactured gum arabic

---

[1] Gum arabic, is recognized by the Food and Drug Administration as a safe stabilizing food additive. 21 C.F.R. § 582.7330. "True gum arabic is gum acacia' that is, it is produced by a species of *Acacia*." **gum** 2014. *Encyclopædia Britannica Online*. gum (adhesive) -- Britannica Online Encyclopedia, http://www.britannica.com/EBchecked/topic/249270/gum (last visited May 30, 2014).

sold to it by TIC. Compl. ¶ 13. As a result of the deficiencies in the Product, OA-T-KA voluntarily recalled "hundreds of thousands of dollars worth of the affected Product…." Compl. ¶ 14. OA-T-KA seeks damages from TIC.

TIC, in its memorandum of law and reply memorandum, contends that the terms of the contract between it and OA-T-KA preclude jurisdiction other than in Maryland, that the terms limit the amount of damages to that which would be below the threshold for diversity jurisdiction in this Court, and that the complaint, in any event, fails to state a cause of action upon which relief can be granted.

## STANDARD OF LAW

### *Fed. R. Civ. P. 12(b)(3)*

On a motion for improper venue, the burden is on the plaintiff to establish proper venue by a preponderance of the evidence. Since the Court will rely on pleadings and affidavits, OA-T-KA need only make a *prima facie* showing that venue is proper here. *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 355 (2d Cir. 2005).

### *Fed. R. Civ. P. 12(b)(6)*

The general legal principles concerning motions under Rule 12(b)(6) are well set-tled:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to re-lief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (*quoting Bell Atl. Corp. v. Twombly*) (footnote omitted).

When applying this "plausibility standard," the Court is guided by "two working principles":

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted). "The application of this 'plausibility' standard to particular cases is 'context-specific,' and requires assessing the allegations of the complaint as a whole." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Inv. Management Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (citation and internal quotation marks omitted).

## ANALYSIS

The Court must first determine whether the additional terms in the acceptance or confirmation sent by TIC to O-AT-KA are binding. If so, then the venue and damages

4

provisions would preclude jurisdiction in this Court. O-AT-KA's position is that the contract between it and TIC was formed via an email exchange and that the additional terms contained in TIC's confirmation are inapplicable. Neither party disputes that the transaction between them involved a sale and purchase by merchants and, as such, is governed by the Uniform Commercial Code.

**Improper Venue and Damages**

O-AT-KA alleges that it has been purchasing gum arabic from TIC since 2004. Compl. ¶ 8. Up until August 2012, TIC's gum arabic was labeled "Arab FT" and manufactured at facilities in the United States. *Id.* ¶ 9. "During that period, O-AT-KA never experienced stability or other performance problems with the gum arabic that TIC supplied to O-AT-KA." *Id.* However, beginning in August 2012, TIC began supplying O-AT-KA with gum arabic labeled "Arab FT-UK," and that "on each occasion thereafter that O-AT-KA manufactured the Product using the Arab FT-UK supplied by TIC, O-AT-KA experienced problems in the finished Product with protein agglomeration, resulting in poor emulsion stability and numerous consumer complaints." *Id.* ¶¶ 10–11.

O-AT-KA relies on TIC's president's declaration to set out the background of the contract formation. Pl.'s Mem. of Law in Opposition to Motion to Dismiss at 3, Nov. 26, 2013, ECF No. 15. In his declaration, Gregory Andon ("Andon"), president of TIC, states that O-AT-KA sent a purchase order for gum arabic by email to TIC. Andon Decl. ¶ 4, Oct. 25, 2013, ECF No. 13-2. O-AT-KA's email purchase order identified the "name, address and telephone number of buyer and seller" as well as "the product purchased; the quantity purchased; the unit and total price; that the sale is 'net 10' . . .; and the date the product is required." *Id.* TIC "responded by sending a purchase order confirmation

which mostly mirrored the terms of O-AT-KA's purchase order." *Id.* ¶ 5. O-AT-KA sent a trucker to pick up the product, and after pick up, TIC sent an invoice by mail to O-AT-KA, which TIC argues was the final transaction document between the parties. *Id.* ¶¶ 6–7; *see* N.Y. U.C.C. § 2-202 (final expression of the parties' agreement cannot be contradicted by evidence of prior agreement). The reverse side of TIC's invoice contained the terms that O-AT-KA argues are inapplicable. Thus, the threshold question is when was the contract formed—at the exchange of emails, or when TIC sent its invoice?

As stated above, the Court will consider, for the purpose of addressing TIC's motion to dismiss, the correspondence between the parties in the formation of the contract between them. Those documents are attached to TIC's motion to dismiss and consist of the following: a blank TIC's invoice showing the language on the reverse side of their standard invoice; O-AT-KA's purchase order dated July 24, 2012; an email confirmation from Selena Jackson sent on July 25, 2012, at 4:16 PM with attached Arab FT letter dated July 18, 2012; an order acknowledgement from Selena Jackson dated July 25, 2012, at 15:57; and TIC's invoice to O-AT-KA dated August 7, 2012. These comprise Exhibits A and B of the Andon declaration, ECF No. 13-2. The exhibits that follow show further orders and contain documents similar to those in Exhibit B. They establish that the pattern was for O-AT-KA to send a purchase order, which TIC confirmed by email, and then followed up, sometime later, with its invoice containing the language, the applicability of which is in dispute here.

Under New York law, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." N.Y. U.C.C. § 2-204. Here, O-AT-KA sent purchase or-

ders to TIC between July 24, 2012, and January 16, 2013. Andon Decl. ¶ 4, Ex.s B–G. TIC then sent acknowledgements which, as described by Andon, mirrored O-AT-KA's purchase order.[2] Under long-standing New York common law, if an offer is made by one party, complete and definite in all material terms, the other party can create a contract by acceptance of that offer. *See Schenectady Stove Co. v. Holbrook*, 101 N.Y. 45, 48 (1885); *Rochester Plumbing Supply Co. v. A. Burgart, Inc.*, 370 N.Y.S.2d 716, 719 (App. Div. 4th Dept. 1975) ("The contract was made when the offer was accepted by Burgart before it was withdrawn and without changing its terms or conditions").

TIC relies on the holding in *Polygram, S.A. v. 32-03 Enterprises, Inc.*, 697 F. Supp. 132 (E.D.N.Y. 1988), in support of its argument that TIC's invoice, mailed after the goods were shipped to O-AT-KA, was the confirmation of the sale, *not* the acceptance email. However, that case is distinguishable. In *Polygram*, the defendant placed orders with the plaintiff, Polygram, which delivered the ordered goods in four shipments accompanied by printed invoices which included terms of sale. *Id.* at 133. The defendant did not object to the terms, but did not pay for the goods, contending they were defective. Polygram sued. The defendant contended that it received the goods, but argued "that the contract for the sale of the goods is unwritten and, therefore, unenforceable." *Id.* The district court held that Polygram's invoices, with their terms of sale, constituted the contract, and since the defendant had not objected within ten days, the contract was enforceable.

By contrast, O-AT-KA received acknowledgements of its email purchase orders via email from TIC, with no additional terms of sale other than the pallet charge of $10,

---

[2] TIC's Order Acknowledgements added a ten dollar pallet charge not present on O-AT-KA's July 24, 2012, order. Neither side has mentioned this extra charge.

which is not in dispute here. TIC then delivered the gum arabic to O-AT-KA's truck, and

mailed the invoice that is at issue here. In that regard, the Court refers to Uniform

Commercial Code, which states in pertinent part as follows:

> (1) A definite and seasonable expression of acceptance or a written con-
> firmation which is sent within a reasonable time operates as an ac-
> ceptance even though it states terms additional to or different from those
> offered or agreed upon, unless acceptance is expressly made conditional
> on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to
> the contract. Between merchants such terms become part of the contract
> unless:
>
>> (a) the offer expressly limits acceptance to the terms of the offer;
>>
>> (b) they materially alter it; or
>>
>> (c) notification of objection to them has already been given or is given
>> within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is
> sufficient to establish a contract for sale although the writings of the par-
> ties do not otherwise establish a contract. In such case the terms of the
> particular contract consist of those terms on which the writings of the par-
> ties agree, together with any supplementary terms incorporated under any
> other provisions of this Act.

N.Y. U.C.C. § 2-207; *see also* Md. Commercial Law Code Ann. § 2-207 (2014) (same

operative language as the New York UCC).

Therefore, once TIC sent back a confirmation of O-AT-CA's purchase order, with

this language in the email, "[p]lease review the attached order confirmation for correct-

ness and advise TIC Gums if any changes need to be made prior to the ship date," the

contract between the parties was complete. Any new terms in the document attached to

the email were subject to N.Y. U.C.C. § 2-207. The attached document, called an Order

Acknowledgement, is dated the same date as the email, and was printed shortly before

the email was sent. It shows that 2,000 pounds of gum arabic FT would be sent to O-

AT-KA at an address in Batavia, New York, with delivery required by August 8, 2012, for

the price of $4,200, with an additional pallet charge of $10. In the Trucker Notes at the bottom of the Order Acknowledgement is a requirement that the "C/A & packing slip & BOL must be handed to consignee at time of delivery." The extensive terms limiting jurisdiction to Maryland and damages to an amount under the threshold for diversity jurisdiction in this Court were not included in the Order Acknowledgement.

The Court finds that for the purposes of the motion to dismiss, the formation of the contract between O-AT-KA and TIC was complete upon O-AT-KA's receipt of the Order Acknowledgement by email. Therefore, the additional terms in the Invoice, sent days later, are of no consequence and not applicable to the parties' contract for gum arabic. Accordingly, TIC's arguments in support of dismissal that rely on application of those terms are rejected.

### Failure to State a Cause of Action

In addition to its improper venue argument, TIC contends that O-AT-KA's complaint fails to state a cause of action for breach of contract. TIC argues that O-AT-KA's conclusion that the gum arabic manufactured in the United Kingdom was defective is merely a conclusion without supporting facts: "O-AT-KA concludes, with no factual support alleged, that because its product problems occurred when it used UK-sourced gum arabic that the UK-sourced gum arabic was the cause of the problem. This is impermissible *post hoc, ergo propter hoc* proposition. . . ." TIC Mem. of Law at 11. However, TIC overlooks O-AT-KA's allegation that it reached the conclusion that the UK-sourced gum arabic was the cause of the problem when it "spent thousands of hours investigating" the cause, and "[a]fter an extensive investigation, O-AT-KA isolated the problem and determined that it was caused by the gum arabic supplied as Arab FT-UK by TIC."

Compl. ¶ 13. TIC also argues that O-AT-KA's claim that TIC "understood and agreed that the gum arabic would not affect the stability of O-AT-KA's product," Compl. ¶ 18, is not supported by facts alleged. The Court disagrees. O-AT-KA relied on the document exchanged in the formation of the contract, one of which was the Gum Arabic letter from Ian Sklar, Director, Quality & Regulator Affairs for TIC. ECF No. 13-4. O-AT-KA's "understanding" is a reasonable one based on the contents of that letter, which was included with the Order Acknowledgement from TIC dated July 25, 2012. ECF No. 13-4. The letter assured O-AT-KA that as between the United Kingdom-manufactured gum arabic, and the United States-manufactured gum arabic, "[t]here will be no difference in product specifications between them, and they are produced from the same raw material under the same process conditions."

Following its review of the complaint and the documents that formed the contract, the Court determines that O-AT-KA's allegations are sufficient to raise its claim above the speculative level. Discovery can proceed so that O-AT-KA and TIC can gather information on this claim and determined whether dispositive motions, or trial, are warranted.

**CONCLUSION**

TIC Gums' motion to dismiss, ECF No. 13, is denied. By separate order, the Court will refer this case to a magistrate judge for the supervision of discovery and any pretrial motions.

IT IS SO ORDERED.

Dated:   December 17, 2014
         Rochester, New York

*/s/ Charles J. Siragusa*
CHARLES J. SIRAGUSA
United States District Judge